1843.

WHEELWRIGHT
*v.*
DEPEYSTER.

WHEELWRIGHT *v.* LOOMER, DEPEYSTER, Administrator,
&c. of CLENDENING, deceased, *et al.*
(*Original Bill.*)

DEPEYSTER, Administrator, &c. *v.* WHEELWRIGHT.
(*Cross Suit.*)

The recording of a second mortgage is not constructive notice to a mortga-
gee of a first registered mortgage.

Although there may be a second mortgagee, yet a first mortgage, who has no
knowledge or information of it, does not, by releasing a part, affect his
rights over the balance of the premises.

Where a husband mortgages his own property for his own debt and, at the
same time, the wife joins her husband in mortgaging to the same mortga-
gee her property for the same debt; and, afterwards, the mortgagee buys
the husband's mortgaged premises and pays him the purchase money
(not crediting it on the mortgage) and thereby the husband's mortgage
merges, the mortgagee, in an attempt to foreclose on the wife's property,
will have to credit the amount at which he bought the husband's pro-
perty. This is held on the ground that the wife is a surety and that
the creditor must first resort to the primary fund and relieve the surety
as far as possible and can do no act to impair the benefit of substitu-
tion without express consent. And where, in such a case, a mortgagee
(holding two such mortgages,) had—when calculating the amount of
purchase of the husband's premises and otherwise from the mortgages
generally—been satisfied, but filed a bill to foreclose and sell the wife's
property, insisting on a balance and that the husband's mortgage was
merged and that the matter of purchase was not to be taken into ac-
count; and another, after-mortgagee, who had advanced money to the
heir of the wife, filed a cross-bill; *it was held*, that the mortgagee filing
the foreclosure bill took nothing and should be dismissed, paying costs;
and that, in the cross-suit, a sale should be had to satisfy the mortgagee
filing such cross-bill.

BILL AND CROSS-BILL.

*April 27,*
*1843.*

*Mortga-*
*gor and*
*Mortga-*
*gee.*
*Husband*
*and wife.*

ON the first day of May, one thousand eight hundred
and thirty-seven, Otis Loomer and Jane T. his wife made
and executed to Paul Spafford, Thomas Tileston and the
complainant Benjamin Wheelwright a mortgage on lots
known as Nos. 187 and 189, Pearl street, New York, and
Nos. 1, 2, 3, 5 and 7 Cedar street, in the same city, for
securing the payment of a bond for twenty-five thousand
dollars and interest. Recorded the third day of May, one

thousand eight hundred and thirty-seven.  These premises were the individual property of the defendant Otis Loomer.

On the same day, the said Loomer and Jane T. his wife (formerly James T. Whittemore) executed another mortgage to the same parties of all the undivided tenth part of all the real estate of which Samuel Whittemore, the father of the said Jane T. Loomer, had died seized—the said tenth being her share of the said estate as an heiress at law. Recorded simultaneously with the other mortgage.

1843.

WHEELWRIGHT
*v.*
DEPEYSTER.

*Surety.
Wife's estate mortgaged for husband's debt.*

The debts secured by both the mortgages were the individual debts of the husband Otis Loomer.

Among the property of the said Samuel Whittemore deceased and covered by the last mentioned mortgage, was a vacant lot on the sixth avenue in the city of New York.

At the time this last mentioned mortgage (embracing a share in the Whittemore property) was executed, a partition suit was going on for its division among the heirs of Samuel Whittemore ; but, before it was ended, Jane T., the wife of the said Otis Loomer, died ; and the commissioners in partition attached her share to her son Charles W. Loomer, who was then an infant.

The aforesaid mortgages were given, in fact, to secure respective debts due to the said Spofford and Tileston and to the complainant Wheelwright—the amount due to the two former being about twelve thousand dollars and to the latter about eight thousand two hundred dollars and neither party having any interest in the claim of the other.

On the twelfth day of February, one thousand eight hundred and thirty-nine, the said Spofford, Tileston and the complainant Wheelwright released a certain part of the premises embraced by the mortgage of the Whittemore property, but such release was not acknowledged until the sixteenth day of January, one thousand eight hundred and forty, nor recorded until two days afterwards.

In the month of February, one thousand eight hundred and thirty-nine, the said Otis Loomer, as special guardian of his said infant son Charles W. Loomer and in pursuance of an order of the court of chancery, conveyed certain pieces of the property set apart to the said Charles W. in

the partition suit, in full satisfaction and discharge of the interest of the said Spofford and Tileston in the said bonds and mortgages. And the said Spofford and Tileston, in December one thousand eight hundred and forty, released and quit claimed to the said Otis Loomer all their own claims, but without prejudice to the rights of the said complainant Wheelwright.

In the month of August, one thousand eight hundred and thirty-eight, the said Otis Loomer, as the special guardian of his son Charles W., applied for leave to mortgage the lot of ground on the sixth avenue and so that the same might be improved and which was allowed. In conformity with this, he did, on the tenth day of July one thousand eight hundred and thirty-nine, execute a bond and mortgage to the defendant in the original suit (and the complainant in a cross-suit) Frederick De Peyster as adminisistrator, &c. of John Clendenning, deceased, for securing three thousand dollars and interest. This mortgage was recorded on the nineteenth day of July one thousand eight hundred and thirty-nine.

On the sixth of February one thousand eight hundred and forty, the said Benjamin F. Wheelwright bought of the said Otis Loomer and had conveyed to him the premises on Pearl and Cedar streets embraced by the first mentioned mortgage, whereby, as the pleadings of the said Wheelwright admitted, the said mortgage was merged in the estate in fee and was no longer a valid and subsisting lien upon the said premises.

The complainant now filed a bill to foreclose the mortgage heretofore given to him and Spofford and Tileston by Loomer and wife on her share of her father's property. He charged that the mortgage made to the said Frederick De Peyster, administrator, &c. was a subsequent security; and in his prayer asked for foreclosure and sale, but he excepted the lot on the sixth avenue embraced by the mortgage to the said De Peyster, unless the mortgaged premises should be insufficient to pay the amount which should, then, be due to the complainant with principal and interest and in that case, he asked that the said lot should be sold.

The defendant, Frederick De Peyster, as such adminis-

trator of the estate of Clendenning, deceased, filed a cross-bill, setting forth *inter alia*, that he had no notice (which was admitted) of the release of part of the premises as before stated at the time the mortgage was made to him; that, at the time the first mentioned mortgage to Spofford, Tileston and Wheelwright was executed, the lot embraced by the mortgage held by him, De Peyster, was vacant and unimproved, but had since been built upon. He charged that Spofford, Tileston and the complainant Wheelwright or some or one of them had information of the appointment of Otis Loomer as special guardian, &c. and had also knowledge of De Peyster's loan. The utter insolvency of the said Otis Loomer was charged; and, also, that the said Wheelwright was now seeking to obtain a decree for the sale of the lot embraced by his, De Peyster's, mortgage, although he knew that in equity he was not entitled thereto. *Prayer* for discovery; and, that the said lot might be exempted from all liability on account of the mortgage held by Wheelwright; but if the latter were still a lien, then, that the value of premises released should be credited and that the said Wheelwright foreclose both his mortgages; and, in case of insufficiency from those sources, then, that the value of the improvements on the sixth avenue lot might be ascertained; and that, out of the proceeds, he might have and receive the value thereof, before Wheelwright, &c.

Mr. *A. W. Bradford*, for the complainant Benjamin F. Wheelwright. The controversy is narrowed down to the lot covered by the Depeyster mortgage.

I. The first question is, as to the effect of the widow's release of dower. It was a release to the heir who owned the fee and not to Mr. Depeyster. Her intention cannot be proved by parol. Its legal effect and operation can only be looked to. It cannot give Depeyster a prior equity.

II. No priority is obtained by reason of the money being spent in improvements, unless Wheelwright had intentionally concealed all knowledge of his lien. Wheelwright knew nothing of the loan about being made by Depeyster. The testimony shows he had no knowledge of Depeyster's mort-

1843.

WHEELWRIGHT
*v.*
DEPEYSTER.

gage until after his original bill was filed. Depeyster was made a party only by amendment.

III. The complainant's mortgage is prior both in date and registry. Depeyster had constructive notice of it.

IV. The recording of the Depeyster mortgage being a a second mortgage is not constructive notice to the first mortgagee. The statute does not make it so. *Frost* v. *Beekman,* 1 J. C. R. 300. It is only notice to subsequent incumbrancers. And see *Cheesebrough* v. *Willard,* 1 J. C. R. 409. The case of *Stevens* v. *Cooper,* Ib. 425, is not against my client. It cannot be applied to the present case. Possession is constructive notice : *Gouverneur* v. *Lynch,* 2 Paige's C. R. 300. The case of *Neimcewicz* v. *Gahn,* 3 Ib. 614, contains the principle as to what will discharge a surety. The doctrine as to notice, to be found in *James* v. *Morey,* 2 Cowen's R. 446, is now incorporated in the registry act. Wheelwright's release has no effect against him.

. V. Wheelwright's mortgage has not been merged or satisfied. Merger is a matter of law and not of fact. And see *Guion* v. *Knapp,* 6 Paige's C. R. 35 ;(a) and *Millspaugh* v. *McBride,* 7 Ib. 509. The intermediate mortgage of W. T. Whittemore prevented a merger.

VI. The case of *Cooper* v. *Whitney,* 3 Hill's N. Y. Rep. 95, is applicable. The equity of redemption acquired may be held still in mortgage by the mortgagee. The doctrine in the case of *James* v. *Morey,* as it appears in 6 J. C. R. 420, was overruled in the court of errors, (2 Cowen's R. 246.) There is no expression apparent of Wheelwright's that goes to a declaration of merger. The property was and always has been insufficient to pay the prior mortgages thereon ; and hence, no actual satisfaction to Wheelwright.

Mr. Bradford also referred to *Starr* v. *Ellis,* 6 J. C. R. 395 ; *Brinckerhoff* v. *Lansing,* 4 Ib. 65, 70 ; *Tice* v. *Annin,* 2 Ib. 125 ; *Skeel* v. *Spraker,* 8 Paige's C. R. 196, and *Spencer* v. *The Executors of Harford,* 4 Wendell's R. 381.

Mr. *Murray Hoffman,* for the infant defendant, Loomer. Two prominent facts appear. 1. The debt or consideration

(a) See this case explained in *Stuyvesant v. Hall,* 2 Barbour's Ch. Rep. 151.

of the mortgage was the debt of the husband for which the wife's estate was mortgaged and collateral to a mortgage of the husband's estate. 2. Wheelwright knew he was taking the security of the wife's inherited estate. *Neimcewicz* v. *Gahn*, 3 Paige, 614, and cases there cited are relied on to show that the relation of principal and surety exists. The creditor is bound to resort to the property of the husband before he goes against the wife or her property as the security. And see *Hayes* v. *Ward*, 4 J. C. R. 129; *Eddy* v. *Traver*, 6 Paige's C. R. 521.

1843.

WHEELWRIGHT
*v.*
DEPEYSTER.

The case of *Lord Harberton* v. *Bennett*, Beatty 386, goes on all fours with the one now before the court.(*a*)

(*a*) As Beatty's Reports remain unfinished and are scarce, the case of *Lord Harberton* v. *Bennett*, is here given. The bill filed in 1820 to foreclose a mortgage, stated that the plaintiff, by indenture dated the 30th of September, 1808, granted to the defendant Bennett and his heirs the demesne and lands of Newbury at the annual rent of £786 14s; that Bennett covenanted to pay the rent and keep the premises in repair. On the 3d of January, 1809, Thomas Wildridge, whose executors are defendants, executed the mortgage to the plaintiff to secure the performance of the covenants by Bennett. That Bennett had suffered a large arrear of rent to grow due and had permitted the premises to fall into a ruinous state. The bill, therefore, prayed an account of what was due by Bennett for rent and what sum would be required to put the premises in repair; for payment, foreclosure and sale. A deed bearing date the 6th of March 1823, was proved at the hearing on the part of the plaintiff, whereby the defendant Bennett had, in consideration of ten shillings, re-conveyed to the plaintiff the premises granted to him by the indenture of the 30th September, 1808.

The Lord-Chancellor:—This bill was filed by Lord Harberton against the representatives of Thomas Wildridge and against other persons interested in the administration of his estate, for the purpose of obtaining payment of a sum claimed to be due on a mortgage, executed by Wildridge, and dated the 3d of January, 1809. No money was due to Lord Harberton from Wildridge, but the deed was executed to Lord Harberton, to secure to him the due payment of rent, and performance of covenants, contained in a deed bearing date the 30th September, 1808, whereby Lord Harberton granted to a Mr. Bennett and his heirs, a mansion house and land in the county of Kildare, at the reserved rent of £786 4s. The grantee paid a sum of £4000 for the purchase of the timber then standing on the estate, and covenanted to pay the rent, and to keep the premises in repair. Wildridge, as surety for Bennett, executed the deed of mortgage for £2,500, conditioned to be void if Bennett should duly pay the rent and perform the covenants. Bennett having suffered the rent to run in arrear, and the premises to be dilapidated, Lord Harberton filed this bill, to have satisfaction made him out of the mortgaged estate. According to the relation the parties stood in at the filing of the bill, the relief sought by the plaintiff was of course. He was entitled

Then, as to the effect of the agreement of the sixth day of February, 1840, which, it is said, constitutes the equity of redemption still a mortgage in the hands of Wheelwright. The reservation therein is perfectly nugatory as against the wife. It does not operate as a mortgage and can have no such effect. It gives no right to redeem; and the estate is absolute without a foreclosure. It may amount to a conditional sale and give a right to an account for rents. We do not contest the doctrine of merger. Here has been a merger. An expressed intention is necessary to prevent it. Wheelwright's bill should be dismissed, with costs to the infant; and he should be compelled, if possible, to refund to the infant what he has already improperly received of his estate.

Mr. *E. H. Owen*, for Depeyster, referred, on the point of

to have the account taken, and the sums due to him raised by sale of the estate pledged to him by Wildridge; but then the representatives of Wildridge, as sureties for Bennett, would have a right to resort to the estate pledged to Lord Harberton and to require Lord Harberton to arm them with all his rights and remedies against Bennett and the estate for their re-imbursement, so far as such rights and remedies could be transferred to them, consistently with the preservation of his own paramount title over the estate, for payment of his future rent and performance of covenants. This right of the surety who pays the debt of another, to the benefit of subsidiary securities belonging to the principal, is the common equity of the court: *Parsons* v. *Briddock*, 2 Vern. 608; *Wright* v. *Morley*, 11 Ves. 12; *Copis* v. *Middleton*, 1 Turn. 224: but these several rights and reciprocal remedies have been extinguished by Lord Harberton, whose act has deprived the representatives of Wildridge of their remedy over. As part of his own evidence, he has proved a deed dated the 6th March, 1823, whereby Bennett, in consideration of ten shillings, re-conveyed the estate to him and his heirs. That subsidiary bond, therefore, which Wildridge's representatives were entitled to resort to for indemnity, has been taken from them by Lord Harberton, and for that reason I think Lord Harberton is not entitled to have the relief he prays against the estate of Wildridge. It has been said that the estate is not worth the annual reserved rent, and, therefore, that the reconveyance to Lord Harberton was no detriment to the representatives of Wildridge; of that Lord Harberton had no right to judge for them. It has in other cases been argued, that a creditor, giving time to the principal, may have benefitted the surety, and therefore his liability ought not to be affected: but it has always been answered, that the creditor had no right to judge for the surety what was best for him. I am, therefore, of opinion that this bill must be dismissed; but upon the whole, I think it must be dismissed without costs, except as to the attorney-general, whose costs the plaintiff must pay.

notice to *Jewett* v. *Palmer*, 7 J. C. R. 65; *Guion* v. *Knapp*, 6 Paige's C. R. 35; *Patty* v. *Pease*, 8 Ib. 277; and as to priority to 1 Story's Equity, 483, 486, (§ 1237, 1239;) 2 Ib. 391.

THE VICE–CHANCELLOR:—Although Mr. Depeyster had not notice in fact of the existence of Wheelwright's mortgage, yet he had notice in law, from the circumstance of its prior registry, and must be deemed to have taken his mortgage, at the time, as the subordinate incumbrance upon the lot in question; and unless something has occurred since the giving of the Depeyster mortgage to displace the priority and preference which belonged to Mr. Wheelwright's security, such priority must still be preserved.

If the question were between these two mortgagees only and the rights of no other person were involved, I should think the facts would not warrant the postponement of Mr. Wheelwright's claim to that of Mr. Depeyster. The former had no actual notice of the mortgage of the latter and nothing had come to his mind to put him on inquiry; and the registry of the second mortgage upon the same premises was not constructive notice to a first mortgagee: *Talmage, President* v. *Wilgers*, Ass't. V. C. Hoffman, MS.(*a*)    A release of

(*a*) The reporter has been favored by Assistant Vice Chancellor Hoffman with his opinion in this case.

*Thomas G. Talmadge, President of the North American Trust and Banking Company* v. *Nathaniel Wilgers, Thomas G. Sherwood and others.* The facts of the case were these: The defendant Wilgers, together with one Burton, mortgaged certain lots marked 18, 19, and 13, in Buffalo, on the thirteenth day of March, 1832, to one Johnson. The mortgage was duly recorded on the twenty-eighth day of the same month of March. Johnson assigned the securities to the complainant on the twenty-second of September, 1838, (by assignment) recorded the eighth day of October, 1838. The consideration was $1,950. Burton, the co-mortgagor, conveyed all his interest to Wilgers on the twentieth of April, 1835. Wilgers and wife conveyed lot No. 18, by warranty-deed to one Prince in consideration of $2,000. The deed was recorded on the twenty-fourth of April, 1835. Prince paid $500 down and gave his bond and mortgage for the balance—and on which it was alleged had been paid the sum of $445 65. That lot. No. 18, was vested in the defendant Sherwood, as assignee of Prince, for the benefit of creditors, by a conveyance dated the third of May, 1837. On the seventeenth day of December, 1836, Johnson, the mortgagee, released lot No. 13 from the lien of the mortgage, which release was recorded. The consideration for the release

a part of the mortgaged premises will not, under such circumstances, impair the right to go against other parts, al-

did not appear. It was supposed by counsel to be nominal merely. The cause had been heard in July term, 1841, and an opinion expressed by his honor conformable to the ultimate decision. A re-argument was, however, requested and had.

*The Assistant Vice-Chancellor* :—I have been much aided by a re-argument of this cause, which has excited considerable interest in the profession in New York, and involves very important practical consequences. Certainly it has been done great justice to upon the re-argument.

I have also taken pains to consult with several experienced and judicious members of the profession, whose business particularly calls them to the passing of titles, loaning of money upon mortgages, and leads them to judge soundly of the effect of legal decisions upon the current business of the community.

The decision of this case depends upon the question whether the decision in *Guion* v. *Knapp*, (6 Paige, 35) applies. In that case, the Chancellor decided that if the mortgagee releases one of several lots bound by his mortgage, with knowledge that the mortgagor had aliened another of such lots, he would be compelled to allow, upon the mortgage, the value of the lot released. The mortgagee there, when he released, had actual notice or strong constructive notice of the prior conveyance of one of the parcels.

It was also decided that, where the purchaser of one of the mortgaged parcels had not put his deed upon record, and there was no actual notice in the mortgage nor anything leading to an inquiry, the rule did not apply. Only the sum actually received upon the release was to be credited.

The Chancellor says :—" The conscience of the party who holds the incumbrance is not affected, unless he is informed of the existence of the facts upon which the equitable right depends or has sufficient notice of the probable existence of the right to make it his duty to inquire whether such equitable right does not in fact exist."

But in the present case, there is neither express notice nor any facts proven to have come to the party's knowledge from which notice is to be inferred. The question is, nakedly, whether the record of the deed is such constructive notice as to be binding upon the mortgagee ? A purchaser of one of the several lots covered by a mortgage has a right to require the sale in the first instance of all the lots remaining subject to be sold before his own is resorted to. If the mortgagor has successively conveyed separate parcels, the sale is to take place in the inverse order of alienation. This is a right between the purchaser in succession and the mortgagor. The mortgagor as to the property retained by him is the principal debtor and the purchasers are sureties, the first of them in point of time being the last to be resorted to, and where notice of a sale of one lot is brought home to a mortgagee, he is not at liberty to do any thing which shall impair the right of having the other lots first applied.

Two instances have been mentioned to me of large estates sold some years ago in New York and one in Albany, in which there was a collateral agreement to release, upon receiving a proportion of the purchase money. This has been done to such an extent that if the lots previously aliened by the

though aliened or covered by a second mortgage, where the first mortgagee neither knew nor had any reason to suppose

mortgagor without a release are to be resorted to only after crediting on the mortgage the value of such released lots at the time, nothing or little will be due and the mortgagee will not receive in fact near the amount of his debt. It is true this result will arise chiefly from the fact of the very high prices of property at the time of such releases. Another case has been stated to me, and it is one which may, in substance, occur frequently. Four lots were mortgaged of equal value. There was an agreement to release two when a house was erected on a third. The fourth lot was conveyed by the mortgagor and his deed recorded, but there was no notice given to the mortgagee. The building being completed, the release of the two lots was executed; afterwards the house burned down uninsured. It is to be remembered that it is not the duty of the mortgagee to keep property insured. He cannot be allowed for the premium (Hopkins Rep.) In the case stated, if the mortgagee must allow the value of the released lots, his debt will be more than three-fourths discharged, without his receiving a cent and the remaining lot will pay less than a fourth of the sum due.

In some instances, also, it is made part of the mortgage provisions that a release shall be executed upon payment of a given sum or proportion. Here, I apprehend, no difficulty can arise. The purchaser would, at least, have no claim for the stipulated amount to be credited in such case.

Again, it may be noticed, that, in New York, at least, as I am informed by many of the best and most prudent practitioners, prior to the decision in *Guion* v. *Knapp* releases were granted without hesitation, often voluntarily, for the advantage of the mortgagor where the mortgagee saw that his security remained ample and without the least care as to whether there had been prior conveyances or not.

Two of these gentlemen remarked that, as a matter of prudence, they have subsequently advised their clients not to release without a search of the records or satisfaction that there were no prior conveyances.

It should also be considered whether any rule which embarrasses transactions between a mortgagee and mortgagor for the extrication of a portion of the incumbered property, as suits his convenience, will not be greatly prejudicial to the mortgagor.

If the mortgagee cannot release without a search and if he find prior conveyances of any portion and runs the risk of having the lot he purposes to release charged to him hereafter at a valuation to be fixed by witnesses and he will, in common caution, be very reluctant to release at all or only on such terms as will prevent any advantage to the mortgagor or upon obtaining the ratification of the alienee.

Now, all the considerations are, of course, of no avail, if the law is settled. But, certainly, the case before the chancellor does not settle it. The inference has been drawn by cautious counsel from his language and nothing more; and, where the point is not settled, the considerations of convenience, of long understood practice and the common assent of the profession are entitled, upon a dubious question, to great weight.

It is said that before the mortgagee releases, he may search the records. The reply is, that it should be as much the duty of the grantee who gets a sub-

· such subsequent alienation or mortgage had been made at the time he gave up a part of his security.  The case of

sequent right to give him actual notice of his purchase and thus put him on his guard.  It strikes me that, on this subject, the equities are balanced.  There is no more conscientious obligation upon the one than upon the other.  The alienee knows of the mortgage or is bound to know of it.  He can give notice to the mortgagee or any assignee who shall appear on the record.

Then, in my opinion, the strict law must decide the point.

It has been said that a duly registered deed is notice to all the world.

This proposition must be much qualified.

The language of the statute is, that " every conveyance not recorded shall be void as against any subsequent purchaser in good faith and for a valuable consideration of the same real estate or any portion thereof whose conveyance shall be first duly recorded."

Thus, the purchaser must not only be one in good faith and for consideration, but his deed must be first recorded to prevail against a prior deed.  This provision of the statute involves another proposition.  If the unrecorded deed is void as to such a subsequent purchaser, it is good as to all except such.  It is exclusively persons answering this description that are protected by and are within the registration act.  Hence it is such persons only who are affected by that act.

The proposition appears to me to be that subsequent purchasers are alone benefitted by the registration act, so as to take preference of an unrecorded deed, and on the other side subsequent purchasers are alone affected by the statute, so as to be bound by a registered deed.  To all other persons, other rules of law apply than those furnished by this statute.  Now, the definition of the term purchaser in the statute is as broad as possible, being " every one to whom any estate or interest in real estate shall be conveyed for a valuable consideration, and every assignee of a mortgage, lease or conditional estate."

It cannot be urged that a mortgagee, releasing one of several lots in his mortgage, is a subsequent purchaser.  He deals with the property, it is true, by relinquishing part of what he had before purchased.  He acquires nothing of a new right in the property in any form or upon any interpretation of the term purchaser.

In the case of *Jackson* v. *Post*, 15 Wendell, 594, it was established that if a *bona fide* conveyance is made to A, who neglects to record his deed, and the grantor then conveys to B, whose deed is recorded, yet a grantee of B cannot hold the land if the deed to A is recorded prior to the recording of his own.

This case arose before the revised statutes and the language of the latter would even more strongly support it than that of the old act.

I may observe that the practice of a large body of conveyancers had not been consistent with this decision.  If, in the above case, a conveyancer found a deed from the owner, with whom he begins, to B duly recorded and unexceptionable, he would have ceased to search against such owner and would have continued it as to B only.  But this case shows that such a course would be unsafe.  However, it is apparent that this decision is in conformity with the strict letter of the statute.  The subsequent purchaser is not fully within the act to be protected until he has recorded his deed, although

*Guion* v. *Knapp*, 6 Paige's C. R. 35, contains the true doctrine on this subject.

in every other respect his purchase is in good faith and for a valuable consideration.

It appears to me that the view of these acts taken by the Irish courts is the sound one. They are considered as avoiding the unrecorded conveyance in favor of the subsequent one or giving the latter a preference by force of their positive provisions, not upon the doctrine of notice.

A late writer (Molesworth on Registration) thus states the doctrines. I have looked into all the cases cited by him :—" It appears by observations made in sections 4, 5 and 7, that a conveyance, being registered, produces upon purchasers under conveyances subsequent to such registration an effect of postponement similar to that of notice.

Even covenants purporting to charge any property which the covenantor might afterwards acquire, being registered, have been preferred to purchasers without notice of such after acquired property : *Gubbins* v. *Gubbins*, Drury & Walsh, 130, in notes. But registration only gives priority, it does not, in itself, operate as notice : *Bushell* v. *Bushell*, 1 S. & St. 90 ; *Latouche* v. *Dunsany*, Ib. 137 ; *Underwood* v. *Courtoun*, 2 Ib. 41 ; *Stuart* v. *Ferguson*, Hayes, 452 ; and see *Hine* v. *Dodd*, 2 Atk. 275 ; the registration of a deed does not operate upon all persons dealing with the property, as notice of its existence, nor even upon those whose conveyances it postpones, as notice of the contents of the memorial : *Burshee* v. *Burshee*, 1 S. & St. 103. Thus, under the English acts, a purchaser may, by procuring the assignment of outstanding legal estates, postpone others whose conveyances are prior in execution and registry to his, the registry not operating as notice : *Wightson* v. *Hudson*, 2 Eq. Ca. Abr. 609 ; *Bedford* v. *Bachus*, Ib. 615 ; *Cater* v. *Cooley*, 1 Cox, 182, though even constructive notice would prevent his doing so : *Morecock* v. *Dickens*, Amb. 678.

But, though registration does not, itself, operate as notice, it may, coupled with other circumstances, be evidence of notice. If it is proved that a person has, in fact, searched the registry by himself or his agent, it will constitute *prima facie* evidence that he has notice of all deeds appearing upon it : *Burshee* v. *Burshee*, 1 S. & S. 103 ; *Hodgson* v. *Deane*, 2 S. & St. 221 ; 2 Pow. on Mortg. 631, in notes. So, though the search be made by the registry officers, as they will be presumed to have done their duty, but if the search is proven to have been limited, the presumption of notice is limited accordingly : *Hodgson* v. *Deane, ut supra.*"

The case then comes to this. Is a mortgagee, prior to executing a release of one portion of the mortgaged premises bound to search the records, as to any conveyances by the mortgagor subsequent to his own mortgage. If he is a subsequent purchaser, he is bound to bear the same consequences as if actually apprised of a prior conveyance. If he is not a subsequent purchaser, he is not bound and the alienee must protect his rights by positive notice. Now, I take a purchaser to mean a party who acquires some new original or additional right in property ; and, I can, by no means, accede to the ingenious argument of counsel, that a new right is acquired in the remaining lots by the release of one. The mortgage was as much a lien upon each lot and every part of each lot as upon the whole.

But, the infant defendant, Charles W. Loomer, has rights which are to be attended to in this case. The lot now in question, among other lots mortgaged to Benjamin F. Wheelwright, was the property of the wife of the mortgagor and the mortgage was given for a debt owing by the husband. About this fact there is no dispute. The mortgage of the wife's property was collateral to the mortgage of the husband's property on Pearl and Cedar streets, in order to secure the same general indebtedness. The wife, then, in respect to her property, is regarded as the surety of her husband: *Niemcewicz* v. *Gahn,* 3 Paige's C. R. 614; S. C. 11 Wend. R. 312; and was entitled to all the equitable rights and privileges of a surety. Among these are the following: that the creditor shall first resort to the primary fund, where, as in this case, there are two, for the payment of his debt so as to relieve, as far as possible, the property of the surety and that the creditor shall do no act, without the express consent of the surety, to impair the benefit of a substitution to which the surety may be entitled. These are familiar rules in this court: *Cheesebrough* v. *Millard,* 1 J. C. R. 409; *Stevens* v. *Cooper,* Ib. 425; *Hayes* v. *Ward,* 4 Ib. 123; *Eddy* v. *Traver,* 6 Paige's C. R. 521.

Now, Mr. Wheelwright has acted in disregard of these principles in relation to the Pearl street and Cedar street lots. Instead of resorting to these pieces of property as the primary fund for payment of his mortgage debt as far as they would go, he becomes the purchaser of the equity of redemption from the mortgagor and pays him the value in money, not taking it in part payment or crediting the amount on the bond and mortgage. This he cannot be allowed to do to the prejudice of the surety. By becoming the purcha-

The result, in my opinion, is, that the record of the conveyance of lot 18 was not constructive notice to the mortgagee when the release of lot No. 13 was made; and, as no actual notice is suggested, the mortgagee is not liable for the value of that lot.

If I had taken an opposite view of the case, it would have been necessary to examine a question which, I think, would fairly arise, viz. whether the complainant would not be entitled to some equity from only $500 being paid on the purchase of lot 18 and a bond and mortgage given for the residue. The master, in computing the amount due, must ascertain what was paid upon the release of lot No. 13 and credit that amount.

ser, the equitable merged in the legal estate which he acquired in that portion of the mortgaged premises; and he insists, in his answer to the cross-bill, that such is the effect of the transaction between him and his mortgagor. And as between him and the surety in the mortgage he can have no reason to complain if the purchase is to be held a satisfaction *pro tanto* of the mortgage debt, because he has thereby undertaken to deprive the surety of the right to compel him to go against that property as the primary fund or, in the event of the surety's paying the debt, to put it out of his power to resort to it as a subsisting security to which he might wish to be subrogated.

Nor do I see that the mortgagee can have any reason to complain, if the price at which he has taken the property, in his purchase of the absolute title, should be adopted as the extent of the relief to which the surety is entitled from the mortgage debt. The price was eight thousand three hundred and fifty dollars; and if from that sum be deducted one thousand dollars paid by him to extinguish a subsequent mortgage and five hundred and fourteen dollars for taxes, there is still six thousand eight hundred and thirty-six dollars which the infant defendant has a right to avail himself of in exoneration of so much of the mortgage debt on his property; and this exceeds the balance of four thousand seven hundred and eighteen dollars and forty-five cents which Mr. Wheelwright now claims to be due.

I must decree the lot in question to be discharged from any further lien or incumbrance of Mr. Wheelwright's mortgage, leaving it to be sold to satisfy Mr. Depeyster's mortgage under the ordinary decree to be entered in the suit upon his cross-bill; and further that the said Wheelright pay to the complainant in the cross-bill, (Depeyster) and to the guardian *ad litem* of the infant defendant in that suit their taxable costs occasioned by this litigation, beyond what would have been incurred in an ordinary uncontested proceeding to obtain a foreclosure of the equity of redemption and a sale of the lot.